IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| APL CO. PTE LTD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -v. | : | Civil Action No: 05-850 (SLR) |
| | : | |
| UNITED SUPPLY CO. LTD., | : | |
| | : | |
| and | : | |
| | : | |
| A cargo of 1700 Cartons of Frozen Shrimp | : | |
| Transported from Khulna, Bangladesh to | : | |
| South Kearny, New Jersey, pursuant to Bill | : | |
| of Lading No. APLU-054094784 dated | : | |
| September 25, 2005, *in rem*, | : | |
| | : | |
| Defendants. | : | |

**PRETRIAL MEMORANDUM ON BEHALF OF PLAINTIFF APL CO. PTE LTD**

Date:  May 22, 2006

HOLLSTEIN KEATING CATTELL
JOHNSON & GOLDSTEIN, P.C.
Lynne M. Parker, Esq. (Bar No. 2811)
1201 N. Orange Street, Suite 730
Wilmington, Delaware 19801
Phone #: (302) 884-6700
Fax #: (302) 573-2507
Attorneys for Plaintiff
APL Co. Pte. Ltd.

Of Counsel:

Edward V. Cattell, Jr. Esq.
Jack Greenbaum, Esq.
Matthew James, Esq.

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................1

POINT I...........................................................................................................2
    DEFENDANT UNITED SUPPLY CO., INC. DOES NOT OWN
    THE CARGO OR THE LETTER OF CREDIT WHICH IS THE
    SUBSTITUTE *RES*...........................................................................2

POINT II .......................................................................................................11
    UNITED HAS UNLAWFULLY CONVERTED THE CARGO
    FROM THE POSSESION OF APL ...........................................11

POINT III ......................................................................................................12
    APL HAS THE LEGAL RIGHT TO POSSESSION OF THE
    CARGO THROUGH THE REMEDIES SET FORTH IN
    FED.R.CIV.P. 64 ....................................................................12

POINT IV ......................................................................................................12
    THIS COURT PROPERLY GRANTED RELIEF TO APL
    PURSUANT TO RULE D ........................................................12

POINT V .......................................................................................................13
    APL IS ENTITLED TO POSSESSION OF THE CARGO
    PURSUANT TO 10 DEL. C. § 3905...........................................13

POINT VI ......................................................................................................14
    APL SHOULD BE AWARDED ITS ATTORNEYS' FEES IN
    THIS MATTER ........................................................................14

CONCLUSION..............................................................................................15

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Acierno v. Preit-Rubin, Inc.*, 199 F.R.D. 157 (D. Del. 2001) ......................................... 11

*Allied Chemical International Corp., v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476 (S.D.N.Y. 1985) .................................................................. 3

*Evergreen Marine Corp. v. 6 Consignments of Frozen Scallops*, 4 F.3d 90 (1st Cir. 1993).................................................................................................................... 10

*Liafail, Inc. v. Learning 2000,* No's 01-599 and 01-678, 2002 U.S. Dist. LEXIS 22620 (D. Del., Nov. 25, 2002) .............................................................................. 11

*Vaughan v. Atkinson*, 369 U.S. 527 (1962).................................................................... 14

## STATE CASES

*Acierno v. Goldstein*, No. 20056-NC, 2005 Del. Ch. LEXIS 176 (Del. Ch., Nov. 16, 2005)................................................................................................................ 14

*Arnold v. Society for Sav. Bancorp, Inc.*, 678 A.2d 533 (Del. 1996) ............................ 11

*Concors Supply Co. Inc., Ltd. v. Giesecke International Ltd.*, No. 83C-MR-122, 1992 Del. Super. LEXIS 150 (Del. Super., Apr. 28, 1992)..................................... 15

*In re Markel*, 254 A.2d 236, 239 (Del. 1969)................................................................ 14

*Jardel Co. Inc. v. Hughes*, 523 A.2d 618 (Del. Super. 1987) ........................................ 15

*Rice v. Ferro*, No. 401-S, 2004 Del. Ch. LEXIS 99 (Del. Ch., Jul. 12, 2004)................ 14

*Salaman v. National Media Corp.*, No. 92C-01-161, 1994 Del. Super. LEXIS 353 (Del. Super., Jan. 14, 1994) ................................................................................... 15

*Taylor v. Snyder*, 741 A.2d 17 (Del. 1999) ................................................................... 14

## FEDERAL STATUTES

28 U.S.C. §1927.............................................................................................................. 14

49 U.S.C. § 80110(a) ........................................................................................................ 3

49 U.S.C. § 80111(b)(3)..................................................................................................... 3

# FEDERAL RULES OF CIVIL PROCEDURE

Fed.R.Civ.P. 64 ................................................................................................ 12

Supplemental Rule C for Certain Admiralty and Maritime Claims of the
      Fed.R.Civ.P. ........................................................................................... 13

Supplemental Rule D for Certain Admiralty and Maritime Claims of the
      Fed.R.Civ.P. ................................................................................ 1, 7, 12-14

Supplemental Rule E for Certain Admiralty and Maritime Claims of the
      Fed.R.Civ.P. ........................................................................................... 12

# STATE STATUTES

6 Del. C. § 7-404 .............................................................................................. 7

6 Del. C. § 7-502 .............................................................................................. 3

6 Del. C. § 5-108(b)(1) and (3) ........................................................................ 8

6 Del. C. § 5-108(h) ....................................................................................... 8, 9

10 Del. C. § 3905 ..................................................................................... 1, 12-15

N.J. Stat. § 12A:7-502 ...................................................................................... 3

# MISCELLANEOUS

U.C.C. § 7-502 .................................................................................................. 3

# TREATISES

1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* 620 (4th ed. 2004) ............... 2, 5

## **INTRODUCTION**

This action was commenced by an ocean carrier, APL Co. Pte Ltd ("APL"), to restore the *status quo ante* after APL mistakenly allowed the wrong party, United Supply Co., Inc. ("United"), who did not possess a bill of lading ("b/l"), to take away a cargo of frozen shrimp, instead of delivering it to the party who did possess and tender a properly endorsed b/l, Southern Food USA, Inc. ("Southern"). T. at 63.[1] APL's mistake did not cause injury to United any more than turning the cargo over to Southern, the b/l holder, would have caused injury. Further, APL's mistake did not cause any injury to Southern because APL immediately took steps to regain possession of the cargo and turn it over to Southern. If Southern was injured in any legally cognizable way, such injury was caused by United's refusal to return the cargo.

Upon United's refusal to return the cargo, APL commenced this action to regain possession of the cargo so that APL could deliver it to Southern. T. at 6-9; Daviner affidavit dated December 7, 2005 at ¶ 2. Toward that end, APL sought to arrest the cargo pursuant to Rule D of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule D"), and Delaware's replevin statute, 10 Del. C. §3905. The Court ordered the cargo be arrested pursuant to Rule D, and the application for a replevin order remains pending. Both United and Southern have filed claims of ownership of the cargo.

---

[1] References to "T" are to the transcript of the hearing held before this Court on December 21, 2005.

## POINT I

### DEFENDANT UNITED SUPPLY CO., INC. DOES NOT OWN THE CARGO OR THE LETTER OF CREDIT WHICH IS THE SUBSTITUTE *RES*

The material facts, shipping practice, and law are not complicated.  The seller of the cargo of shrimp at issue, Shampa Ice and Cold Storage, Ltd. ("Shampa"), delivered the cargo to APL in Bangladesh for carriage to the United States.  Shampa instructed APL to issue a b/l naming Shampa as the shipper and consigned to **the order of** Sonali Bank.  The underscored words made the b/l negotiable.[2]

In the ordinary case, a consignee bank would endorse the b/l, *i.e.* negotiate it, to the purchaser of the goods, or to the purchaser's bank, which would then endorse it to the purchaser.  The purchaser would then tender the endorsed b/l to APL in the U.S. to obtain delivery of the cargo or could sell the cargo and endorse the b/l over to another purchaser while the goods were still in transit.  The second purchaser could sell the goods and endorse the b/l onward or tender the b/l to APL for delivery of the cargo.

Upon negotiation of a bill of lading, the holder obtains the following rights, as a matter of law:

(1) Title to the document;

(2) Title to the goods;

(3) All rights accruing under the law of agency or estoppel, including rights to goods delivered to the bailee after the document was issued; and

---

[2] It is customary in international commerce to issue b/l's in sets of three originals, for required distribution in accordance with the shipper's bank arrangements.  When one original is tendered back to the ocean carrier for delivery of the cargo at destination (known as "accomplished"), the other b/l's of the set become null and void.  *See* 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* 620 (4th ed. 2004).

(4) The direct obligation of the issuer to hold or deliver the goods according to the terms of the document free of any defense or claim by the issuer except those arising under the terms of the document or under this article …

U.C.C. § 7-502(1); 6 Del. C., § 7-502.

An ocean carrier has no opportunity or need to know about the underlying sale transaction, as the carrier relies on the instructions contained in the b/l as prepared by the shipper.  Terrian Dep. at 21-22; Ahmed Dep. at 70-72.

Shampa instructed APL to name United as the "notify party" in the b/l.  A notify party is the person who receives notification that the goods have arrived. A notify party may be the intended first purchaser, or it may be an agent of either the shipper or the purchaser, such as a selling or purchasing agent or a freight forwarder.  There should be no dispute about the fact that a notify party obtains no right to take delivery of the cargo simply by being designated as such in the b/l.  Only the holder of the endorsed b/l has that right. 6 Del. C. § 7-502; U.C.C. § 7-502, N.J. Stat. § 12A:7-502 (the cargo was to be delivered in New Jersey).  *See also* the Federal Bill of Lading Act, formerly known as the Pomerene Act, 49 U.S.C. § 80110(a), which is only applicable to a b/l issued in the U.S., but provides guidance as to bills of lading generally.[3]

---

[3]  The Federal Bill of Lading Act (Pomerene Act), 49 U.S.C.S. § 80111(b)(3)(A) & (B) states:

[a] common carrier may deliver the goods covered by a bill of lading to—

(3) a person in possession of a negotiable bill if--

(A) the goods are deliverable to the order of that person; or

(B) the bill has been indorsed to that person or in blank by the consignee or another indorsee.

There is no dispute that United was never the holder or transferee of an endorsed b/l or a named consignee of the cargo at issue.

Sometimes, the initial sale arrangement breaks down or otherwise changes while the goods are still in transport, necessitating that a b/l with different details be issued in substitution for the initial b/l.  For example, if the initial b/l was issued to the order of the initial purchaser's bank, a substitute b/l would have to be issued to the order of the replacement purchaser's bank as consignee.  If the notify party was the initial purchaser or its agent or freight forwarder, a substitute b/l would have to name a new notify party.  Again, an ocean carrier has no knowledge of these sale arrangements.  Terrien Dep. at 80-81; Ahmed Dep. at 67.

If the shipper/seller itself requests the issuance of a substitute b/l, an ocean carrier will require either that the initial b/l be returned to it first for cancellation, or else that a bank guarantees that the initial b/l will be returned for cancellation.  T. at 73, l. 8-20; Terrien Dep. at

---

*Id.*  This statutory premise is recited in *Allied Chemical International Corp., v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476 (S.D.N.Y. 1985):

> Pursuant to the Pomerene Act, a carrier operating under an order bill of lading is justified in delivering the goods to one lawfully entitled to them or to one in possession of an order bill by the terms of which the goods are deliverable to his order; or which has been indorsed to him, or in blank by the consignee.

*Id.* at 483-484.  In addition:

> Where goods are shipped under an order bill of lading, it would seem logical to include in any definition of proper delivery the fulfillment of the carrier's duty to ensure, absent specific agreement to the contrary, that the cargo is released to the holder of the properly endorsed bill.

*Id*. at 482, n. 3.

30-32. This is to protect the carrier against the possibility that the initial b/l might be fraudulently sold to a third party and not returned for cancellation. It also protects the eventual holder of the substitute b/l from someone else going to the ocean terminal and taking the cargo away using the initial b/l. *Id.*

If a bank itself asks the ocean carrier to issue a substitute b/l and undertakes ("guarantees") to return the initial b/l for cancellation, that is sufficient. T. at 73, 75 l. 20-25; Terrien Dep. at 170-71, 196, 201; M.A. Hossain Dep. at 26-28, 32-33; Ahmed Dep. at 36-37. There is no reason the carrier would need to have the initial b/l physically in hand before issuing the substitute b/l. For example, billions of dollars are paid every day via bank letters of credit in international sale transactions, because a letter of credit substitutes a bank's credit in place of the credit of an individual purchaser of goods. A carrier is equally justified in relying on a bank's undertaking to return an initial b/l for cancellation as a seller of goods is in relying on a bank's letter of credit. A closer example is the customary shipping practice to deliver cargo without tender of a b/l in reliance on a bank guarantee if the b/l is delayed in banking channels or is in transit. Terrien Dep. at 94-95. *See* Schoenbaum, *supra.*

In this case, the consignee bank to whose order the initial b/l was issued, Sonali Bank, asked APL in Bangladesh to issue a substitute b/l changing the name of the notify party to Southern, and undertook to return the initial b/l for cancellation. The shipper, Shampa, joined in that request. Terrien Dep. at 201; Ahmed Dep. at 39. APL issued a substitute b/l in justified reliance on Sonali Bank's undertaking to return the initial b/l for cancellation, and in accordance with Bangladeshi law and trade practice. Rebeiro Dep. at 53, 57-58, 64-66; 77, 86-87, 125 and 169-170. APL's justified reliance on Sonali Bank's undertaking was borne out because Sonali

Bank **did** return the initial b/l in due course. Ahmed Dep. at 128-29. No one in this lawsuit makes a claim under the initial b/l.

However, United's name was mistakenly left in APL's computer system as the notify party, and the computer system consequently issued notification to United when the cargo was ready for delivery. T. at 64, 75 l. 9-15; Terrien Dep. at 121, 178-79. Although **Southern**, which was the holder in due course of the b/l, tendered the fully negotiated endorsed (substitute) b/l to APL, the computer system only provided "yes" and "no" options to indicate whether an endorsed b/l had been tendered, not **who** endorsed or tendered it. Terrien Dep. at 61, 156. Therefore, when United's truck arrived at APL's gate with the correct reference number, and the computer indicated a b/l had been tendered, APL turned the container over to United. This had never occurred before at APL. T. at 67; Terrien Dep. at 180; Daviner Dep. at 8.

United had contracted to purchase this container of shrimp from Shampa and to pay for it by means of a bank letter of credit in favor of Shampa. Payment under a letter of credit is triggered by the presentation of specified documents containing specified information. In this case, the bank which issued the letter of credit, Gold Bank, found in the survey reports a discrepancy from the letter of credit requirements. Gold Bank asked United whether to waive the discrepancy and permit payment. United did not waive the discrepancy. Instead, United told Gold Bank not to return the documents, despite Sonali Bank's repeated demands for their return. United took advantage of the documentary discrepancy to try to obtain an agreement with Shampa to substitute this container of shrimp in place of one that United purchased from Shampa some time ago, which was rejected by the FDA, without any cash payment.

United claims it did reach such an agreement with Shampa. No such written agreement has been produced, and the existence of such an agreement is contradicted by the testimony of

Gold Bank's testimony. Olivia Lopez of Gold Bank testified, among other things, that United itself unilaterally decided that this container was a substitute for the rejected container, that United claimed to be still negotiating with Shampa, that United refused to pay for this container and was not going to get an endorsed b/l without making payment, and that Sonali Bank therefore called for the return of the initial b/l from Gold Bank. Lopez Dep. at 42-53, 57-58, 61-62.

Ultimately, it is immaterial whether or not there was an agreement between United and Shampa. If APL had delivered the container to Southern upon tender of the endorsed b/l, United would have no basis to claim delivery of the cargo from APL or to assert an *in personam* claim for damages against APL. *See* 6 Del. C. § 7-404 (No liability for good faith delivery pursuant to document of title). If Shampa sold the shrimp to Southern in breach of an alleged agreement between Shampa and United, then United's remedy, if any, would be only against Shampa, inasmuch as Southern would be a bona fide holder in due course of the b/l, and APL would have performed its legal obligation to deliver the goods to the b/l holder.

In addition, if there was some sort of conspiracy between Shampa and Southern, as speculated by United, then United's remedy would be against Shampa and Southern, not APL. If APL had turned the goods over to Southern on tender of the endorsed b/l, a negotiable instrument under Delaware and New Jersey law, APL would have performed its sole obligation.

APL's mistake in turning the cargo over to United does not change any of the above. APL's Rule D and replevin action merely sought to restore the *status quo ante*, *i.e.* to obtain the cargo for delivery to the only holder of an endorsed b/l, Southern. APL did not thereby injure United any more than APL would have injured United if APL had delivered the goods to Southern in the first place.

On January 6, 2006, this Court directed that the goods be released to United against security in the amount of the value of the goods plus interest. That security, a letter of credit, stands as a substitute *res* as if the container were still in the Court's custody. As United and Southern have filed claims to the goods, and hence to the substitute *res*, the issue to be resolved by the Court is which of them is the legal owner of the goods. The one who gets the goods (or their cash value) will have been made whole, and the one who has no legal title to the goods will have no claim against APL, which injured no one by **correcting** a previous mistake.

United's questioning of witnesses implies that issuing two b/l's is "wrongful." As explained above, however, it is not "wrongful" if the initial b/l is in the possession of a bank which undertakes to return it to the carrier for cancellation. In this case, the initial b/l was in the hands of Gold Bank at the time Sonali Bank gave its undertaking, but that makes no difference. Gold Bank abided by its legal obligation **not** to give the b/l to United when United refused to pay for the goods, and eventually returned the b/l to Sonali Bank on the latter's instructions to do so. Banks are used every day to transfer commercial documents in exchange for payments because banks are statutorily required and can be trusted to hold onto the documents until the conditions for their delivery are met. 6 Del. C. § 5-108 (h) *See* Daviner Dep. at 137.

Contrary to United's rhetoric during the depositions, there were never two b/l's "outstanding" or "in circulation." The initial b/l was always held in trust by Sonali Bank and Gold Bank. As provided in Section 5-108 of the Uniform Commercial Code, which governs Gold Bank's obligations as the issuer of the letter of credit and Sonali Bank's rights as the presenter of documents, an issuer has up to seven business days after presentation of documents to honor a letter of credit or else give the presenter notice of any documentary discrepancies. 6 Del. C. § 5-108 (b)(1) and (3). If the issuer dishonors the presentation because of documentary

discrepancies, as Gold Bank did in this case: "An issuer that has dishonored a presentation shall **return** the documents or **hold them at the disposal of**, and send advice to that effect to, **the presenter**." 6 Del. C. § 5-108 (h) (Emphasis added.)

The only reason Gold Bank did not return the b/l and other documents to Sonali Bank sooner is that United wrongfully told Gold Bank not to do so. United was well aware that Sonali Bank was repeatedly demanding the return of the initial b/l. Therefore, it is nonsense for United to suggest it somehow relied on the initial b/l or was injured by it. United did not pay any money or give any other consideration for that b/l and was not going to get the b/l without paying for it.

The supposed existence of two b/l's at one time was not the cause of the confusion in this case, or of any injury. The confusion was caused by the error that left United's name in the computer system as the notify party. The confusion, however, did not cause any legal injury to anyone at all for the reasons discussed above.

United's questioning has also implied that the substitute b/l was wrongfully "backdated" because it was dated the same day as the initial b/l. This entirely misconceives the meaning of "backdated" or "antedated." The b/l was not backdated. T. at 73-74. A b/l is wrongfully "backdated" if it states that the cargo was loaded on a date earlier than it actually was loaded, which could defraud a purchaser whose contract might call for the cargo to be shipped by a deadline. It is perfectly normal practice to issue a b/l that shows the cargo was "shipped on board" on the true date it was loaded, or an issuance date as of the loading date. Rebeiro Dep. at 233. Indeed, b/l's may be issued days after the ship has sailed because of the logistics of issuing a great many of them on each voyage, but state the loading date instead of the date the piece of paper was generated. Further, it is quite customary to make a substitute b/l a "carbon copy" of the initial b/l, with only the changes necessitated by a change in the underlying sale. T. at 65;

Ahmed Dep. at 44-45; Rebeiro Dep. at 231. In any event, the date on the b/l caused no confusion and no injury in this case.

The case which bears the closest resemblance to this matter is *Evergreen Marine Corp. v. 6 Consignments of Frozen Scallops*, 4 F.3d 90 (1st Circuit 1993), which has been previously cited to the Court. *Evergreen* involved a notify party, Gloucester, which misrepresented that it had made payment for the cargo of scallops and that the bill of lading was en route in order to obtain delivery from the ocean carrier, Evergreen. After obtaining possession of the cargo, Gloucester became insolvent. A bank holding an Article 9 security interest from Gloucester took possession of the scallops. However, another bank, which was the true holder in due course of the bill of lading, demanded possession of the cargo from Evergreen. Evergreen, of course, could not deliver the cargo since it had already released it to Gloucester. Evergreen demanded return of the cargo from Gloucester and the bank holding the security interest, but were refused.

The question before both the District Court and the Appellate Court was which of the two competing banks had the right to possession of the cargo. If the bank holding the security interest prevailed, Evergreen would be required to pay the full value of the cargo to the bank holding the bill of lading. In this matter, Southern is the holder in due course of the b/l. United is the party which obtained the goods without legal title.

The District Court, in the *Evergreen* case, incorrectly analogized the delivery by Evergreen to a sale of goods. In reversing and vacating this holding, the Appellate Court held that an ocean carrier's possession of the goods is not akin to a sale, but rather a bailment. Under the circumstances, the Appellate Court ruled that the holder of the bill of lading was entitled to possession over the rights of the secured party.

Pursuant to the *Evergreen* decision, a holder in due course of a bill of lading maintains a superior right to possession over an innocent secured third party. Therefore, Southern, as the holder of the bill of lading, maintains a superior right to possession over United, which obtained possession purely by mistake and without title. When previously given the chance, United had refused to pay for the cargo and take up the bill of lading. When it obtained possession of the cargo to which it had no legal title, it converted the cargo to its own use by refusing to return it to APL upon request.

### POINT II

### UNITED HAS UNLAWFULLY CONVERTED THE CARGO FROM THE POSSESION OF APL

The District Court of Delaware has recently stated that:

> Conversion is the "wrongful exercise of dominion over the property of another, in denial of his right, or inconsistent with it." *Acierno v. Preit-Rubin, Inc*., 199 F.R.D. 157, 165 (D. Del. 2001) (citation omitted). In order to establish a successful conversion claim, [plaintiff] must establish that, at the time of the alleged conversion: (1) it held an interest in the property; (2) it had a right to possession of the property; and (3) [defendant] converted the property. *See Arnold v. Society for Sav. Bancorp, Inc.*, 678 A.2d 533, 536 (Del. 1996).

*Liafail, Inc. v. Learning 2000*, No's 01-599 and 01-678, 2002 U.S. Dist. LEXIS 22620 at *31 (D. Del., Nov. 25, 2002).

In this matter, United converted the cargo from APL's possession by taking advantage of APL's error when it notified the incorrect party of the cargo's arrival. Without an endorsed b/l, and not having paid for the cargo, United can have no legal title to it, whereas Southern has made payment and received an endorsed b/l from Sonali Bank. APL holds an interest in the cargo until delivery is made to the proper holder of the Bill of Lading. Until this is accomplished, APL has a continuing legal right to possession of the cargo. However, United has wrongfully exercised

its dominion over the cargo, denying APL's right to possession of and ability to deliver the cargo

to Southern.

## POINT III

### APL HAS THE LEGAL RIGHT TO POSSESSION OF THE CARGO THROUGH THE REMEDIES SET FORTH IN FED.R.CIV.P. 64

Fed.R.Civ.P. 64 provides:

> At the commencement of and during the course of an action, all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought, subject to the following qualifications: (1) any existing statute of the United States governs to the extent to which it is applicable; (2) the action in which any of the foregoing remedies is used shall be commenced and prosecuted or, if removed from a state court, shall be prosecuted after removal, pursuant to these rules. The remedies thus available include <u>arrest</u>, attachment, garnishment, <u>replevin</u>, sequestration, and other corresponding or equivalent remedies, however designated and regardless of whether by state procedure the remedy is ancillary to an action or must be obtained by an independent action.

*Id*. (emphasis added).

APL obtained initial relief in this action through the arrest of the Cargo pursuant to Rule

D.  APL's request for a writ of replevin pursuant to 10 <u>Del</u>. <u>C</u>. § 3905 remains pending.

## POINT IV

### THIS COURT PROPERLY GRANTED RELIEF TO APL PURSUANT TO RULE D

Rule D states:

> In all actions for possession, partition, and to try title maintainable according to the course of the admiralty practice with respect to a vessel, <u>in all actions so maintainable with respect to the possession of cargo or other maritime property</u>, and in all actions by one or more part owners against the others to obtain security for the return

> of the vessel from any voyage undertaken without their consent, or
> by one or more part owners against the others to obtain possession
> of the vessel for any voyage on giving security for its safe return,
> the process shall be by a warrant of arrest of the vessel, cargo, or
> other property, and by notice in the manner provided by Rule B(2)
> to the adverse party or parties.

*Id.* (Emphasis added). Rule D provides the mechanism for this Court to instruct the Marshal to

arrest the cargo to prevent its disposition until a possessory dispute can be resolved.

The procedure for arresting the cargo lies within Supplemental Rule C(3)(b)(ii):

> If the property that is the subject of the action is other property,
> tangible or intangible, the warrant and any supplemental process
> must be delivered to a person or organization authorized to enforce
> it, who may be: (A) a marshal; (B) someone under contract with
> the United States; (C) someone specially appointed by the court for
> that purpose; or, (D) in an action brought by the United States, any
> officer or employee of the United States.

*Id.* Finally, Supplemental Rule E(4)(f) provides:

> (f) <u>Procedure for Release from Arrest or Attachment</u>. Whenever
> property is arrested or attached, any person claiming an interest in
> it shall be entitled to a prompt hearing at which the plaintiff shall
> be required to show why the arrest or attachment should not be
> vacated or other relief granted consistent with these rules.

*Id.*

In this matter, the Court granted APL the requested relief under Rule D and ordered the

arrest of the cargo. The underlying issue is legal title to the cargo, from which will follow the

final relief requested by APL, which is possession of the *res* for delivery to the title holder,

Southern.

## POINT V

## APL IS ENTITLED TO POSSESSION OF THE CARGO PURSUANT TO 10 <u>DEL</u>. <u>C</u>. § 3905

This Court, through its supplemental jurisdiction, may order relief pursuant to the state

law of Delaware. In this respect, 10 <u>Del</u>. <u>C</u>. § 3905, Delaware's replevin statute, provides:

> When any goods or chattels are unlawfully detained from the owner or the person entitled to the possession thereof, such owner or person may have remedy to recover the same by a civil action.

*Id.* APL seeks relief under this statute in the alternative, or in addition to relief under Rule D.

"Replevin is a form of action for the recovery of personal property which has been taken or withheld from the owner unlawfully." *Taylor v. Snyder*, 741 A.2d 17 (Del. 1999) (citation omitted). Moreover, "[t]he action of Replevin is available to anyone who claims ownership, <u>or the right to immediate possession</u> of a chattel. *In re Markel*, 254 A.2d 236, 239 (Del. 1969) (emphasis added; citation omitted).

## POINT VI

## APL SHOULD BE AWARDED ITS ATTORNEYS' FEES IN THIS MATTER

This Court is empowered to award attorneys' fees as part of its equitable powers when a party has proceeded in bad faith, has acted vexatiously, or has unnecessarily prolonged or delayed litigation. *See Vaughan v. Atkinson*, 369 U.S. 527, 530 (1962) (holding that the award of counsel fees "is part of the historic equity jurisdiction of the federal courts"); *Acierno v. Goldstein*, No. 20056-NC, 2005 Del. Ch. LEXIS 176, *7 (Del. Ch., Nov. 16, 2005) (recognizing exception in equity to the "American Rule" requiring that all parties bear their own attorneys fees when it appears that one party has proceeded in bad faith, has acted vexatiously, or has relied on misrepresentation of fact or law in connection with advancing a claim in litigation); *Rice v. Ferro*, No. 401-S, 2004 Del. Ch. LEXIS 99 (Del. Ch., Jul. 12, 2004) (same); 28 U.S.C. §1927 ("any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct").

Here, APL has asserted a claim in equity (for replevin) under 10 <u>Del</u>. <u>C</u>. § 3905, and its admiralty analog, a claim under Rule D, for possession of the property. Thus, this Court is sitting in equity and has the equitable power to require United to pay APL's attorneys fees. Moreover, United, in the face of multiple indisputable items of evidence to the contrary (including the duly negotiated b/l), has deliberately and unnecessarily prolonged this litigation. Accordingly, an award of fees is appropriate.

APL also seeks punitive damages on its state law claims. Under Delaware law, punitive damages are appropriate if the conduct of a party is outrageous because of evil motive or reckless indifference to the rights of others. *Jardel Co. Inc. v. Hughes*, 523 A.2d 618 (Del. Super. 1987); *Salaman v. National Media Corp.,* No. 92C-01-161, 1994 Del. Super. LEXIS 353 (Del. Super., Jan. 14, 1994). This reckless indifference may be shown by willful conduct, or conduct exhibiting an "I don't care" attitude. *Concors Supply Co. Inc., Ltd. v. Giesecke International Ltd.*, No. 83C-MR-122, 1992 Del. Super. LEXIS 150, *14 (Del. Super., Apr. 28, 1992). Thus, in *Concors*, the Delaware Superior Court upheld an award of punitive damages when the defendant willfully converted a shipment of kitchen goods for his own personal gain. *Id*. at *14.

Here, the facts show that United willfully converted the cargo for its personal gain, and with knowledge that it had no right to possession or title thereto. Thus, APL has demonstrated the requisite degree of reckless indifference to APL's right to possess the cargo and, therefore, a punitive damages award is appropriate. In this regard, however, APL seeks only its attorney's fees and costs in this matter.

## <u>CONCLUSION</u>

United's claim to the cargo should be denied, Southern's claim to the cargo should be granted, and APL should be permitted to draw on the letter of credit for the value of the cargo, $176,800, plus interest, and pay those proceeds to Southern in full satisfaction of APL's

obligations under the bill of lading held by and tendered to APL by Southern. In addition, APL should be awarded its attorneys' fees and costs in this action.

HOLLSTEIN KEATING CATTELL
JOHNSON & GOLDSTEIN, P.C.


By:    /s/ Lynne M. Parker
       Lynne M. Parker, Esq. (No. 2811)
       1201 N. Orange Street, Suite 730
       Wilmington, Delaware 19801
       Phone #: (302) 884-6700
       Fax #: (302) 573-2507
       Attorneys for Plaintiff
       APL Co. Pte. Ltd.

Of Counsel:

Edward V. Cattell, Jr. Esq.
Jack Greenbaum, Esq.
Matthew James, Esq.